**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **AMGEN INC., *et al.*,**<br>**Plaintiffs,**<br>**v.**<br>**XAVIER BECERRA, *et al.*,**<br>**Defendants.** | **Civil Action No. 24-3571 (JEB)** |
| **GENENTECH INC.,**<br>**Plaintiff,**<br>**v.**<br>**DOROTHY FINK, *et al.*,**<br>**Defendants.** | **Civil Action No. 25-290 (JEB)** |

**MEMORANDUM OPINION**

Where a discount might be had, enterprising minds will seek it out. With these companion suits, drug companies seek to correct what they view as an overuse of the 340B program, a component of the Public Health Service Act that allows certain healthcare providers to obtain drugs from those companies at reduced prices. Plaintiffs maintain that the Government impermissibly certified a set of clinics as 340B covered entities in violation of statutory requirements. As the Court agrees, it will grant them summary judgment on their central claim.

# I. Background

## A. Regulatory Background

In 1992, Congress enacted section 340B of the Public Health Service Act. See Veterans Health Care Act of 1992, Pub. L. No. 102-585, § 340B, 106 Stat. 4943, 4967-71 (codified as amended at 42 U.S.C. § 256b). Colloquially known as the 340B Program, it offers certain healthcare providers — "covered entities" — the ability to purchase drugs at significantly discounted prices from pharmaceutical companies. Astra USA, Inc. v. Santa Clara County, 563 U.S. 110, 113 (2011) (quotation marks omitted). Discounts can be steep and result in a "strikingly generous" price to program participants. Eli Lilly & Co. v. Kennedy, 2025 WL 1423630, at *1 (D.D.C. May 15, 2025).

What limits participation in this enticing program? Two main requirements. First, a provider must be "covered" in that it meets one of fifteen enumerated statutory conditions. At issue in this suit are entities that sought coverage by virtue of treating sexually transmitted diseases. Per the statute, these entities must "receiv[e] funds under [a federal STD program] . . . through a State or unit of local government" and be "certified" pursuant to the agency's process. See 42 U.S.C. § 256b(a)(4)(K). Second, a covered entity may purchase discounted drugs to treat only its "patient[s]," id. § 256b(a)(5)(B), defined as individuals with whom the covered entity has provided "a health care service or range of services . . . which is consistent with the service or range of services for which grant funding . . . has been provided to the entity." 61 Fed. Reg. at 55157–58. A qualifying patient must also be one with whom "the covered entity has established a relationship" such that the entity maintains the individual's healthcare records and "responsibility for the care provided." Id. at 55157. In sum, only covered entities may access discounted 340B drugs, and only to treat their patients.

Congress also directed the Secretary of Health and Human Services to develop a process to certify certain covered entities, including ones who qualified by dint of STD funding. See 42 U.S.C. § 256b(a)(7)(A). To that end, providers seeking certification as STD-covered entities must jump through several (albeit simple) hoops to show the Health Resources and Services Administration (to whom the Secretary has delegated that authority) that they receive the statutorily required funding. HRSA requires entities to provide it with details about the type, amount, and duration of support the provider receives. The agency also requires the entity's authorizing official to attest to the information's accuracy and confirms the funding with state government officials for certification. See Amgen, No. 24-3571, ECF Nos. 36-1 (Declaration of Chantelle Britton), ¶¶ 5–8; 45 (Amgen Admin. Record) at 00008 (HRSA letter to drug manufacturers explaining process). Entities may be recertified annually. Sagebrush Health Servs. v. Kennedy, --- F. Supp. 3d ---, 2026 WL 1130313, at *1 (D.D.C. Apr. 27, 2026); 42 U.S.C. § 256b(a)(7)(E). HRSA makes available the full list of 340B participants via the online Office of Pharmacy Affairs Information System (OPAIS). Albany Med. Health Sys. v. HRSA, 2026 WL 592593, at *2 (D.D.C. Mar. 3, 2026).

B. Factual and Procedural Background

One prolific participant in the 340B program is Sagebrush Health Services, a nonprofit healthcare organization that has received funding awards from various state governments' federal STD grants. See, e.g., Amgen Admin. Record at 013334. Sagebrush does not merely receive qualifying STD funding, provide individuals with services arising from that funding, and order discounted drugs on their behalf, however. It contracts with entirely separate healthcare clinics that specialize in areas like rheumatology, dermatology, or oncology. Each clinic signs an agreement with Sagebrush for the latter's "expertise in the management and treatment of

individuals with sexually transmitted diseases" and its qualifying state-grant funding. See, e.g., id. at 13208 (master affiliate agreement). Under these agreements, Sagebrush commits to seeking modification of a qualifying state award to include "reference" to the clinic "locations." Id. at 013210. The clinics then receive an administrative-services fee from Sagebrush, report to Sagebrush a monthly itemized list of 340B drugs they used, and send Sagebrush the net collections of "all [c]laims for the 340B [d]rugs" included in that report. Id. at 013213. Many of those clinics receive their own 340B certification and are the subject of this litigation.

Drug manufacturers believe that the relationship between Sagebrush and its contracting clinics amounts to abuse of the 340B program. Four manufacturers — Amgen, Inc., Eli Lilly and Company, UCB, Inc., and Genentech, Inc. — have brought two related suits to challenge what they characterize as Sagebrush's scheme to magnify discounted drug pricing for clinics that are statutorily ineligible. See Amgen, No. 24-3571, ECF No. 1 (Amgen Compl.), ¶¶ 4–8; Genentech, No. 25-290, ECF No. 1 (Genentech Compl.), ¶ 19. In their telling, Sagebrush receives a nominal amount of a state's resources from a federal STD grant — say, a handful of rapid HIV testing kits or a dozen boxes of condoms. Amgen, ECF No. 35-1 (Amgen MSJ) at 8–10. Then, based on the contract relationship between Sagebrush and wholly separate clinics, the manufacturers say that Sagebrush impermissibly leverages the token qualifying funding it received into 340B eligibility for unrelated clinics that do no meaningful STD treatment. Id. That move thus translates a handful of boxes of condoms into multimillion-dollar discounts for myriad separate entities.

The two lawsuits — one brought by Genentech and the second by the other three manufacturers — challenge HRSA's former and current certifications of eleven separate healthcare clinics as 340B "covered entities." Amgen Compl., ¶ 6; Genentech Compl., ¶ 6. The

eleven clinics fall into two buckets. Eight held active certifications as recently as last year, see, e.g., Amgen Admin Record at 013727, and operate in Nevada under a single grant award by that state. Id. at 000134–000135. Three are 340B clinics in Connecticut whose certification has since been terminated. Id. at 013372, 013414; Genentech, ECF No. 34 (Genentech Admin. Record) at 013443. The drug companies nonetheless seek to set those prior certifications aside in a bid to prevent the clinics from "retain[ing] 340B profits to which they were not entitled." Amgen, ECF No. 41 (Amgen Reply) at 21. All eleven clinics participate (or participated) in the program under the umbrella of Sagebrush Health Services, and Sagebrush is identified as the main entity on HRSA's website. See, e.g., Amgen Admin. Record at 000143. The clinics have received discounts to the tune of over $30 million between 2022 and 2025. See Amgen Compl., ¶¶ 87–89; Genentech Compl., ¶ 80.

Two interim developments in the litigation bear mentioning. First, a different healthcare provider, Community Care Resources of Florida, moved to intervene as a Defendant in this suit to offer additional arguments in support of the 340B program, under which it is certified. Amgen, ECF Nos. 27 (Mot. Intervene); 27-2 (Memo.) at 1. The Court granted that motion, and Community Cares participated in subsequent summary-judgment briefing. Amgen, ECF Nos. 32 (Mem. Op.); 38-1 (CCRF MSJ). Second, this pair of suits is not the Court's only foray into the web of litigation among the drug manufacturers, HRSA, and Sagebrush. Sagebrush itself brought a related suit challenging HRSA's decertification of certain of its clinics in recent years. The Court granted summary judgment to the Government in that case, holding that HRSA had the authority to remove the clinics from the 340B program, and it had not acted arbitrarily or capriciously in so doing. Sagebrush, 2026 WL 1130313, at *1. That Opinion did not concern

the propriety of HRSA's initial certification of any clinics — only whether it had impermissibly removed them later.

The Court will now consider the antecedent question left open in the Sagebrush litigation: whether certain clinics have been impermissibly certified under the 340B statute. The parties have cross-moved for summary judgment on this question. The drug companies have offered a range of bases on which to invalidate HRSA's certifications of the eleven clinics and seek to undermine the Government's certification process writ large. See generally Amgen MSJ. Defendants counter that the 340B certification process and HRSA's application of it to the clinics comport with statutory requirements. Amgen, ECF No. 36 (Gov. MSJ) at 1. As the parties' briefing in each case is "substantially the same," Genentech, ECF No. 21-1 (Genentech MSJ) at 2 n.1, the Court will, for the sake of simplicity, primarily refer to filings in the Amgen case except where necessary.

## II. Legal Standard

Summary judgment must be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006). A fact is "material" if it is capable of affecting the outcome of the litigation. Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895. A dispute is "'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Liberty Lobby, 477 U.S. at 248; see also Scott v. Harris, 550 U.S. 372, 380 (2007); Holcomb, 433 F.3d at 895. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine

dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

Although styled as Cross-Motions for Summary Judgment, the submissions in this case seek the Court's review of an administrative decision. The standard set forth in Rule 56(c), therefore, does not apply to the Administrative Procedure Act counts because of the limited role of a court in reviewing the administrative record. See Sierra Club v. Mainella, 459 F.Supp.2d 76, 89–90 (D.D.C. 2006). "[W]hen a party seeks review of agency action under the APA, . . . the district judge sits as an appellate tribunal." Rempfer v. Sharfstein, 583 F.3d 860, 865 (D.C. Cir. 2009) (quotation marks and citation omitted). The APA "sets forth the full extent of judicial authority to review executive agency action for procedural correctness." FCC v. Fox Television Stations, Inc., 556 U.S. 502, 513 (2009). It requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

## III. Analysis

The drug manufacturers offer a litany of grounds for setting aside the clinics' 340B certifications as unlawful. They contend that discounted 340B pricing should apply only to drugs that are used to treat sexually transmitted diseases and distributed to patients seeking treatment for such diseases — not to drugs that address the conditions and patients typically treated by rheumatology or oncology clinics. See Amgen MSJ at 24–31. Plaintiffs also take issue with the type of assistance HRSA considers to be qualifying and the agency's certification process. Id. at 18–24, 34–36. The Court need not address these issues, however, because the manufacturers' source-of-aid argument — *viz.*, that the clinics receive aid "through" Sagebrush rather than a state or local government as is statutorily required, id. at 32–34 — carries the day.

Some preliminary detail is warranted. The eleven at-issue clinics hold individual 340B certifications as "Sagebrush Health Services" locations. That is, a given clinic is certified under a main entity name — Sagebrush Health Services — and a "Subdivision Name" identifier — say, "Rainbow Rheumatology." Amgen Admin. Record at 013452 (OPAIS entry for Rainbow Rheumatology). HRSA's records, including communications between the agency and state government agencies, similarly treat each clinic as an apparent subdivision of Sagebrush Health Services. See, e.g., id. at 013450 (email from HRSA to Nevada health official referencing "Sagebrush Health Services" with individual clinics under "Sub Name" column); id. at 013604–013606 (Nevada officials confirming "Sagebrush receives funding" when asked whether multiple individual clinics received qualifying funding).

That impression is confirmed by record evidence of the states' funding awards. In 2023, Nevada awarded $600 of its federal grant funds for STD treatment and prevention to Sagebrush Health Services. Id. at 013334. Sagebrush is the named "subrecipient" of Nevada's federal STD grant, id., and a Sagebrush official signed the grant papers. Compare id. (Jami Dybak [*sic*] signature), with id. at 012636 (Jami Dybik identified as Sagebrush Health Services vice president). The grant award lists a number of clinics — including some of the challenged eleven — as covered "locations" within the "scope of work" of Sagebrush's grant. Id. at 013339. It identifies those clinics as separate sites, each under the umbrella of "Sagebrush Health Services." Id.

As discussed above, however, the clinics are not subdivisions of a parent Sagebrushian institution. They are separate organizations that contract with Sagebrush for its qualifying state-grant funding and ability to be added to a state award as Sagebrush "locations." See, e.g., id. at

013208–013210. For this privilege, they compensate Sagebrush via an administrative-services fee. Id. at 013213.

The drug manufacturers contend that this relationship — where Sagebrush receives 340B-eligible funding and disburses it to wholly separate entities, thereby granting them access to 340B discount pricing — makes the clinics ineligible "sub-subgrantees." Amgen MSJ at 32. A "covered entity," recall, is one "receiving funds under [a federal STD grant] . . . through a State or unit of local government." 42 U.S.C. § 256b(a)(4)(K). In the drug manufacturers' telling, the state as a grant recipient from the federal government may distribute funding to subgrantees like Sagebrush to trigger 340B eligibility, but Sagebrush may not further spread that funding to additional "sub-subgrantees" like the clinics. See Amgen MSJ at 32–34. Because the clinics have received their purportedly qualifying funding "through" a private entity — Sagebrush Health Services — not "a State or unit of local government," id. at 32 (citing 42 U.S.C. § 256b(a)(4)(K)), Plaintiffs believe that the clinics are ineligible.

The drug companies stake their case on a dictionary definition of the word "through" in the absence of clarifying caselaw on this question. Id. The Court need not definitively interpret that provision because the Government appears to agree — and Intervenor-Defendant Community Cares takes no position on the question, see CCRF MSJ at 2 n.1 — that HRSA should not certify entities that do not receive funding directly from a state or local government. In its Motion for Summary Judgment, the Government asserted that "HRSA does not certify subgrantees," Amgen, ECF No. 36 (Gov. MSJ) at 19 (formatting altered), and noted that HRSA "took action to remove" clinics from the 340B program whose eligibility was based on a state award "that listed only one Sagebrush site" as the grant recipient. Id. The Government, then, has taken the position in this litigation that Sagebrush cannot unilaterally distribute to different

organizations funds received from state grants and thereby confer 340B eligibility on those organizations. It contends, however, that the clinics have not run afoul of that statutory requirement because the inclusion of each clinic "individually" on the state's award notice demonstrates that every clinic received funding "through" the state, not through Sagebrush. Id.

Having reviewed the record, the Court must conclude that the clinics received their qualifying funding through Sagebrush, not through the states. The record makes clear that only one entity received grant funding from the relevant state (either Nevada or Connecticut): Sagebrush. See, e.g., Amgen Admin. Record at 013317 (Sagebrush listed as "subrecipient" of Nevada grant); id. at 000134 (all grants distributed to entity with same employer identification number (EIN)). Sagebrush is listed in the grant documentation as the recipient entity, its officials signed the grant award, id. at 013317, and they are listed as the points of contact for each clinic's OPAIS entry on HRSA's website. See, e.g., id. at 013372 (Southington Clinic); 013452 (Rainbow Rheumatology); 013822 (Dr. Ann Wierman, MD). Although Nevada did list individual clinics on its 2023 grant award, the very description belies the explanation that each clinic could be receiving funding "through" the state rather than Sagebrush. The award contemplates that the "Business Associate" — that is, Sagebrush, id. at 13329 — will treat patients at "their infusion-based specialty clinics" and incorporate such treatments into "their" — again, Sagebrush's — 340B program. Id. at 013322. The only reference to individual clinics is as "locations" included in the grant recipient's — once more, Sagebrush's — "[s]cope of work." Id.

Nor does anyone think that the clinics are organizational subdivisions of Sagebrush Health Services the way that a central doctor's office might have distinct satellite locations but operate under a single entity. Sagebrush's series of agreements with the clinics, including the

Master Affiliate Agreement that covers five of the challenged clinics, makes the distinction quite clear. Id. at 013221, 013225–013226. They refer to Sagebrush as the non-profit organization receiving grants from the Nevada and Connecticut public-health departments and the clinics as separate "practice location[s]" of (yet another) third-party "Affiliate" contracting with Sagebrush. Id. at 013208 (distinguishing between Sagebrush and Affiliate); 013210 (clinics are "Affiliate practice location[s]"); see also id. at 013227 (agreement identifies Sagebrush as "Covered Entity" and clinic as "Administrator").

This matters for 340B certification for two main reasons. First, as discussed above, Congress contemplated specific categories of providers that would qualify for 340B pricing. Receiving funding through a state or local government comes with additional constraints, such as documentation requirements and limitations on funding uses. The record reflects those guardrails in the grant-award paperwork that Sagebrush signed. See, e.g., Amgen Admin. Record at 013317–013322 (Nevada award to Sagebrush). Permitting Sagebrush to act as an intermediary and insert numerous independent clinics as "locations" within its own grant, id. at 013322, circumvents the flexible but clear statutory requirement that eligible covered entities must receive qualifying STD funding "through" a state or local government. See 42 U.S.C. § 256b(a)(4)(K).

Second, certifying each clinic as a separate covered entity based on the fraction of state funding transmitted to it by Sagebrush permits those clinics to access 340B pricing for otherwise-ineligible patients. That is because covered entities can get reduced-price drugs to treat their patients — individuals whose records the covered entity "maintains" and for whom the entity has provided "a health care service" consistent with the scope of its grant funding. See 61 Fed. Reg. at 55157. For example, if Centennial SACI, one of the eleven challenged clinics,

distributes condoms to its patient base, it can then obtain discounted drugs for all of those patients — presumably a wider patient base than Sagebrush's standing alone.

HRSA protests that the agreements between Sagebrush and the clinics reflect its guidance that patients may "receive treatment from a provider providing other services through a contractual agreement with a covered entity." Amgen, ECF No. 43 (Gov. Reply) at 10. But that very statement reveals the incongruity of the Government's position. Its guidelines define a patient as, first and foremost, a patient of "the covered entity" that retains "responsibility for the care provided" to the patient even where other providers step in. See 61 Fed. Reg. at 55157. Here, Sagebrush — not each individual clinic — would be the covered entity and only its patients would be eligible for discount pricing. There is thus no need, and no statutory justification, for each clinic to be certified as a covered entity. And to the extent that the only patients for whom 340B pricing is claimed are Sagebrush's patients, not the clinic's — a fact unclear from the record — Sagebrush would still be the sole covered entity, thus obviating the need for the clinics to demonstrate that they received state or local funding at all. But see Gov. MSJ at 19 (implying that program eligibility for clinics predicated on clinics being "listed as individual grant recipients"); Amgen Admin. Record at 013165–013166 (state official referencing "requirement" that grant award "list each site by name and address").

The covered entity/subrecipient relationship exists between Sagebrush and each of the eleven challenged clinics. Id. at 13221 (Master Affiliate Agreement covering Rainbow Rheumatology, Eastern Rheumatology, Fire Mesa ID); 013226 (same covering Battleborn Health Care, Reno Clinic); 013227 (agreement covering Hummingbird Clinic); 013243 (Centennial SACI); 013258–013259 (Dr. Ann Wierman, MD); id. at 000134 (HRSA records showing same taxpayer number corresponding to Sagebrush with separate 340B certifications for challenged

clinics). The Court thus concludes that any funding the clinics received was through Sagebrush, not a state or local government, rendering them statutorily ineligible for 340B certification as covered entities. It will order that the clinics' present and prior certifications be set aside and that the Government not recertify any of the clinics based on funds received through Sagebrush or another private entity, rather than through a state or local government.

The Court will thus grant Plaintiffs the relief they seek: decertification of each of the eleven clinics whose certifications they challenge. The drug companies also seek various declaratory judgments vindicating their separate legal theories that the clinics are ineligible on different statutory grounds or because they were certified via an unlawful process. See Amgen Compl. at 41–42; Genentech Compl. at 42. As they anchored their suits to individual clinic certifications that this Court has already invalidated, however, it will decline to stretch further and pass on questions of purely declaratory relief. Ctr. for Biological Diversity v. Regan, 729 F. Supp. 3d 37, 51–52 (D.D.C. 2024) ("[C]ourts are not compelled to reach alternative theories" that would "grant relief already justified on the basis of the first theory.") (quotation marks and citation omitted). The Court will thus dismiss the remaining claims for relief without prejudice. Id. at 53–54 (adopting this approach).

## IV. Conclusion

For the foregoing reasons, the Court will order that Plaintiffs' Motions for Summary Judgment are granted in part, that the challenged clinics' certifications as covered entities are set

aside, and that the remaining claims for relief are dismissed without prejudice. A separate Order so stating shall issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date: August 14, 2026